**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TALITHIA SMITH,

      Plaintiff,

v.                                         Civil Action No. 3:18cv858

VIRGINIA HOUSING
DEVELOPMENT AUTHORITY,

      Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on two motions:

(1) Defendant Virginia Housing Development Authority's ("VHDA") Motion for Summary Judgment (the "Motion for Summary Judgment"), (ECF No. 26); and,

(2) Plaintiff Talithia Smith's Motion Seeking Leave to File Late Witness and Exhibit List (the "Motion for Leave"), (ECF No. 30).

VHDA filed the Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.[1] Smith responded to the Motion for Summary Judgment, (ECF No. 28), and VHDA replied, (ECF No. 29). VHDA has not responded to the Motion for Leave and the time to do so has expired. On January 16, 2020, the Court heard oral argument on the Motion for Summary Judgment. These matters are ripe for disposition.

---

[1] Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

(a) **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2] For the reasons stated below, the Court will grant the Motion for Summary Judgment and will deny as moot the Motion for Leave.[3]

## I. Procedural Background

In this employment action, Smith seeks recovery for race and gender discrimination she alleges she faced during her employment with VHDA. She also asserts that her supervisors retaliated against her for her complaints about that discrimination. In her Complaint, Smith raised seven counts under three statutes: (1) Title VII, 42 U.S.C. § 2000e; (2) Title VI, 42 U.S.C. § 2000d; and, (3) 42 U.S.C. § 1981. VHDA filed a Partial Motion to Dismiss to which Smith responded in agreement. The Court then dismissed Smith's allegations of gender discrimination brought under 42 U.S.C. § 1981. (May 28, 2019 Mem. Order 4, ECF No. 12.) During an Initial Pretrial Conference with Counsel from both Parties, Counsel for Smith orally moved to withdraw an additional count from the Complaint, which the Court granted. (July 30, 2019 Order 1, ECF No. 18.) Smith's remaining counts are as follows:

**Count One:** Race Discrimination and Retaliation, in violation of 42 U.S.C. § 1981.

**Count Two:** Race Discrimination, in violation of 42 U.S.C. § 1981.[4]

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Complaint alleges that VHDA violated Smith's rights pursuant to 42 U.S.C. § 1981; 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and, 42 U.S.C. § 2000d, *et seq.* ("Title VI").

[3] In the Motion for Leave, Smith seeks leave to file out of time her witness and exhibit lists, which specify the witnesses and exhibits she will present at trial. (*See* Mem. Supp. Mot. Leave 1–2, ECF No. 31.) Because the Court will grant the Motion for Summary Judgment as to all counts, this matter will not proceed to trial. Therefore, the Court will deny the Motion for Leave as moot.

[4] In the title of Count Two, Smith states that she brings Count Two in violation of Title VI, 42 U.S.C. § 2000d. In the Partial Motion to Dismiss, VHDA stated that it believed Smith brought Count Two in violation § 1981 because Smith makes no allegations that VHDA received

**Count Four:** Race Discrimination and Retaliation, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

**Count Five:** Gender Discrimination and Retaliation, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

**Count Six:** Race Discrimination and Retaliation, in violation of Title VI, 42 U.S.C. § 2000d, *et seq.*

Following discovery, VHDA filed the instant Motion for Summary Judgment. The Court now turns to the instant motions.

## II. Factual Background[5]

In its Motion for Summary Judgment, VHDA provides a comprehensive overview of Smith's employment with VHDA. It provides support, in the form of admissible evidence, for each of the facts it presents.

In her response to the Motion for Summary Judgment, Smith identifies those facts in VHDA's Motion for Summary Judgment that she does not dispute. She also states that she "disputes many of the statements of fact by VHDA." (Resp. Mot. Summ. J. 3, ECF No. 28.) Smith submits only two of her own declarations in support of the facts that she disputes.

Because Smith only sets forth those facts that she disputes and VHDA provides facts, supported by evidence, that show a full picture of Smith's employment with VHDA, the Court will first set forth the facts as presented by VHDA. It will then identify those facts that Smith disputes. Smith does not dispute many of the facts set forth by VHDA.

---

federal funds. (Mem. Supp. Partial Mot. Dismiss 1 n.1, ECF No. 9.) Smith did not contest this in her response to the Motion to Dismiss. (Resp. Partial Mot. Dismiss 1, ECF No. 11.)

Although it does not affect the final outcome on the instant Motion for Summary Judgment, because Smith did not contest VHDA's characterization of her claims as presented in the Partial Motion to Dismiss, the Court will presume that Smith intended to bring Count Two pursuant to § 1981.

[5] In ruling on the Motion for Summary Judgment, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to Smith as the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.    Facts as Presented by VHDA**

      **1.    VHDA and General Allegations as to Smith's Employment at VHDA**

"VHDA is a political subdivision created by the Commonwealth of Virginia to assist Virginians in obtaining quality, affordable housing through public-private partnerships with local government, community service organizations, lenders, realtors, developers, and others." (Mem. Supp. Mot. Summ. J. ¶ 1, ECF No. 27 (citing Mem. Supp. Mot. Summ. J. Ex. A "Burke Declaration" ¶ 3, ECF No. 27-1).) VHDA asserts that it "is an equal opportunity employer and has policies prohibiting discrimination, harassment, and retaliation in the workplace." (*Id.* ¶ 2 (citing Mem. Supp. Mot. Summ. J. Ex. B "Smith Deposition" 18–20, ECF No. 27-2; Mem. Supp. Mot. Summ. J. Ex. C "VHDA Policies" 1–9, ECF No. 27-3).) Smith does not contest that VHDA has several policies that are relevant to the instant Motion for Summary Judgment, including: (1) a Code of Conduct; (2) a Performance Management Policy; (3) a Disciplinary Action Policy; (4) policies that address timesheets and pay; and, (5) an Alternative Work Schedule Policy. (*Id.* ¶¶ 3–5; Resp. Mot. Summ. J. 2.)

"In October 2006, VHDA hired [Smith] as a full-time Associate Desktop Support Analyst in its Information Technology Services . . . Department." (Mem. Supp. Mot. Summ. J. ¶ 7 (citing Burke Decl. ¶ 4; Smith Dep. 23).) Smith worked in "Service Central" within the Information Technology Services Department. (*Id.* ¶ 10 (citing Mem. Supp. Mot. Summ. J. Ex. E "Information Technology Services Organization Chart," ECF No. 27-5).) "Service Central provides technical assistance and support to VHDA employees on issues related to computer systems, software, hardware, phones, and printers." (*Id.* (citing Mem. Supp. Mot. Summ. J. Ex. F "Kirkland Declaration" ¶ 4, ECF No. 27-6).) It "also researches, tests, and deploys new or upgraded [Information Technology ("IT")] programs and solutions to VHDA employees." (*Id.*

4

(citing Kirkland Decl. ¶ 4).) "A critical component of Service Central's IT support function is a dedicated phone line available to VHDA employees and others during the hours of 7:30 a.m. to 5:30 p.m., Monday through Friday," known as the Service Line. (*Id.* ¶ 21 (citing Kirkland Decl. ¶ 15; Kirkland Decl. Ex. 1; Mem. Supp. Mot. Summ. J. Ex. I "Service Central Description," ECF No. 27-9).)

"On December 26, 2012," VHDA promoted Smith to "Desktop Support Analyst with a five percent increase in salary." (*Id.* ¶ 8 (citing Burke Decl. ¶ 5; Smith Dep. 51; Mem. Supp. Mot. Summ. J. Ex. D "Smith Promotion," ECF No. 27-4).) VHDA contends, and Smith does not dispute, that Smith's "job responsibilities did not change when she was promoted." (*Id.* ¶ 9 (citing Burke Decl. ¶ 6, Smith Dep. 51–52); Resp. Mot. Summ. J. 2.) VHDA explains that throughout her employment, Smith was a non-exempt employee, meaning that she had "to timely submit bi-weekly timesheets documenting the hours worked during the pay period."[6] (*Id.* ¶ 4 (citing Smith Dep. 18, 20–22; VHDA Policies 23–26).) In June 2018, Smith voluntarily resigned from VHDA. (*Id.* ¶ 9 (citing Burke Decl. ¶ 6; Smith Dep. 51–51).)

### 2.  Smith's Performance at VHDA 2006 to 2014

#### a.  2006 to 2011

From 2006—when Smith began working at VHDA—until 2011, David Kohan, a Caucasian male, supervised Smith. (*Id.* ¶ 31 (citing Burke Decl. ¶ 7; Smith Dep. 67–68).) During her deposition, Smith "testified [that] she had a good working relationship with Kohan." (*Id.* (citing Smith Dep. 68).) Smith testified that Kohan did not discriminate against her on the

---

[6] VHDA also says that employees above Smith, such as Senior Desktop Support Analysts, Lead Desktop Support Analysts, and Desktop Engineers "were exempt employees, paid on a salary basis and not eligible for overtime pay." (Mem. Supp. Mot. Summ. J. ¶ 15 (citing Kirkland Decl. ¶ 8).)

basis of race or gender. (*Id.* (citing Smith Dep. 68).) She also testified that Kohan did not

retaliate against her. (*Id.* (citing Smith Dep. 68).)

<h3 style="text-align:center">b. <u>2011 to 2013</u></h3>

From 2011 to 2013, Mark McBride, a Caucasian male, supervised Smith. (*Id.* ¶ 32

(citing Burke Decl. ¶ 8; Smith Dep. 68–69).) Smith testified in her deposition that McBride, as

with Kohan, did not discriminate against her on the basis of race or gender. (*Id.* (citing Smith

Dep. 69–71).) Smith also stated that McBride did not retaliate against her. (*Id.* (citing Smith

Dep. 69–71).) Smith further testified that McBride treated her fairly and "gave her fair

performance reviews." (*Id.* (citing Smith Dep. 71–72).)

"McBride administered Smith's Annual Performance Review for the period of July 1,

2011 to June 30, 2012 ('2012 Performance Review')." (*Id.* ¶ 33 (citing Smith Dep. 72; Mem.

Supp. Mot. Summ. J. Ex. L "2012 Performance Review," ECF No. 27-12).) The 2012

Performance Review, which VHDA attaches, included the following comments:

> [Smith] has a strong customer focus and works to maintain good customer relationships with her customers and her peers. However, she needs to learn to maintain them without spending so much time "fraternizing." In addition, by completing necessary documentation in a concise and professional manner, her effectiveness in collaboration could be greatly improved.
>
> [Smith] also needs to focus on efficiently managing her own time. We cannot have additional incidents like the recent one where her assistance was needed urgently, but her whereabouts were unknown. While I appreciate her commitment to and interest in her fellow associates, she needs to focus on the efficient completion of her tasks. In addition, she must be aware of the impact her prolonged absences have on the rest of the Service Central staff.
>
> [Smith] takes pride in her work, but sometimes spends time "chatting" that would be better spent documenting her efforts. I encourage her to focus on increasing her efficiency and professionalism in the coming year.

(*Id.* (citing 2012 Performance Review 131–32).)

When asked about this performance review in her deposition, Smith testified that she believed the feedback as to "fraternizing" was fair. (Smith Dep. 73.) She explained that "[m]ost of the time, I was in the cafeteria. One of the ladies there was having a hard time with her son. So I was just there trying to console her." (Mem. Supp. Mot. Summ. J. ¶ 34 (citing Smith Dep. 73–74).)

### c.     2012 to 2013

From in or around 2012 to 2013, Jeffrey Kyle Howard ("JK Howard), an African American male, supervised Smith. (*Id.* ¶ 35 (citing Mem. Supp. Mot. Summ. J. Ex. G "Howard Declaration" ¶ 5, ECF No. 27-7).)[7]  In her deposition, Smith testified that "JK Howard did not discriminate against her because of her race or [gender], nor did he retaliate against her." (*Id.* ¶ 35 (citing Smith Dep. 80–81).)

On December 5, 2013, "JK Howard administrated Performance Correction Counseling for" Smith. (*Id.* ¶ 36 (citing Howard Decl. ¶ 6; Smith Dep. 78; Mem. Supp. Mot. Summ. J. Ex. M "2013 Correction Counseling," ECF No. 27-13).)  VHDA attaches the December 5, 2013 Performance Correction Counseling. (2013 Correction Counseling.)  In this document, which Smith signed, VHDA "identified '[c]ommunications, responsibility, judgment, leave tracking, customer service and core duties' as areas where [Smith] needed to show improvement." (*Id.* 1.)  It also provided examples, including:

> Code of Conduct was violated on Friday, November 15th when [Smith] needed to leave the office to take her son to a doctor's appointment and notification was given to a peer in Desktop Support.  Notification was not sent to Jackie Gibbs[8] or

---

[7] In 2016, Howard became the Managing Director of Information Technology Services— the "highest-ranking position in" that department. (Mem. Supp. Mot. Summ. J. ¶ 11 (citing Howard Decl. ¶ 3; Smith Dep. 25–26; Information Technology Services Organization Chart).)

[8] Neither Smith nor VHDA identify Jackie Gibbs's position at VHDA.

her manager, [JK] Howard. No time has been entered in I-employee[9] for this
time.

[Smith] continues to have issues with her scheduling. She is often "missing" from
her desk and her tickets are lower than that of her peers. If this does not improve
immediately, [Smith] will lose her [Alternative Work Schedule] privileges. She
must communicate her whereabouts and put leave in as appropriate. [Smith] has
been leaving at 4:00 p.m. on the Thursday's [sic] that she was supposed to work
until 5:30. She has been putting on her timesheet that she was staying until 5:30
p.m. This can be considered fraud, especially when collecting overtime.

(*Id.*)

### 3.    Smith's Performance at VHDA 2015 to 2018

From January 2015 to May 2015, Darleen Kirkland, a Caucasian female, "directly
supervised" Smith. (Mem. Supp. Mot. Summ. J. ¶¶ 12, 37 (citing Kirkland Decl. ¶ 5; Smith
Dep. 81–82).) In May 2015, VHDA added the Service Central Supervisor position "as a layer of
authority between Kirkland and" Smith. (*Id.* (citing Kirkland Decl. ¶ 5).) From May 2015 to
March 2017, Lester Pike, a Caucasian male, filled this position. (*Id.* ¶¶ 15, 37 (citing Kirkland
Decl. ¶ 5).) In April 2017, Stephanie Martin, a Caucasian female, became the Service Central
Supervisor. (*Id.* (citing Kirkland Decl. ¶ 5).)

VHDA avers, but Smith disputes, that "[f]rom early 2015 until [Smith's] resignation,
[Smith] was consistently the lowest-performing employee among the Support Analysts and Lead
Analysts in Service Central." (*Id.* ¶ 40 (citing Kirkland Decl. ¶ 50).)

---

⁹ I-employee "is VHDA's time-tracking system." (Mem. Supp. Mot. Summ. J. 11 n. 5
(citing Smith Dep. 78–79).) In her deposition, Smith testified that she "sometimes . . . would
forget" to enter her time in I-employee, although she understood it was a job requirement. (*Id.*
(citing Smith Dep. 79–80).)

### a. <u>2016</u>

#### i. <u>2016 Performance Correction Counseling</u>

"In or around June 2016,[10] Kirkland and Pike informally counseled [Smith] on the amount of time she spent on personal phone calls during the workday." (*Id.* ¶ 41 (citing Kirkland Decl. ¶ 27; Smith Dep. 110).) Kirkland "generated a report of [Smith's] calls during working hours between the dates of December 19, 2015 and May 18, 2016." (*Id.* ¶ 42; (citing Kirkland Decl. ¶ 28; Mem. Supp. Mot. Summ. J. Ex. N "Smith's Calls Report," ECF No. 27-14).) VHDA attaches this report. (Smith's Calls Report.) "The report showed that, during that period of time, [Smith] spent approximately twenty-six (26) hours of work time on her VHDA cell phone and desktop phone with her mother, aunt, and a caregiver for her uncle or son." (Mem. Supp. Mot. Summ. J. ¶ 42 (citing Kirkland Decl. ¶ 28; Smith's Calls Report; Smith Dep. 115–18).) In her deposition, Smith "admits that these were not work-related calls." (*Id.* (citing Smith Dep. 115–18).) "The phone records pulled by Kirkland further confirmed that [Smith] was sending and receiving . . . personal text messages during work hours." (*Id.* ¶ 43 (citing Kirkland Decl. ¶ 29).)

VHDA avers that "[a]lthough neither Kirkland nor JK Howard can remember the exact date, Kirkland also informally counseled [Ted] Daneker, [a Caucasian male], who was a Lead Analyst,[11] on the amount of time he spent on personal phone calls in or around 2016." (*Id.* ¶ 44

---

[10] VHDA notes that in her Complaint, Smith "alleges this counseling happened in June or July of 2015. [Compl. ¶ 8, ECF No. 1.] [Smith] admitted in her deposition that she is not sure of the timing. [Smith's] Dep. 111, 114.] VHDA records show that it happened in the summer of 2016. [Kirkland Decl. ¶ 27.]" (Mem. Supp. Mot. Summ. J. 12 n.6.)

[11] Smith testified at her deposition that all Service Central employees performed the same job functions. She presents no evidence to support this. VHDA explains, and provides evidence to show, that a Lead Analyst is a different position than the position Smith held as a Desktop Support Analyst. (*See* Mem. Supp. Mot. Summ. J. ¶¶ 14, 19 (citing Kirkland Decl. ¶¶ 6, 13).) Lead Analysts, unlike Smith, are exempt employees, who VHDA "paid on a salary basis," were

(citing Kirkland Decl. ¶ 30; Howard Decl. ¶ 10).) VHDA asserts that Smith's "excessive use of work time for personal matters, including but not limited to personal phone calls, continued in 2017 and 2018." (*Id.* (citing Kirkland Decl. ¶ 31).)

Also in 2016, "Pike and Kirkland verbally counseled several Support Analysts, including [Smith], regarding following Service Central policy." (*Id.* ¶ 45.) "The policy stated that Support Analysts must change their status to 'Not Ready' in Cisco Finesse[12] and 'Away' in Jabber[13] every time they left their desks." (*Id.*) "In addition, the policy stated that Support Analysts must log out of Cisco Finesse at the end of each shift." (*Id.*) VHDA states that Smith "did not receive written correction counseling in connection with these policy violations." (*Id.* (citing Kirkland Decl. ¶ 32; Smith Dep. 169–76).)

JK Howard, who served as the Managing Director of Information Technology Services at the time, "was aware of [Smith's] performance counseling in 2016, and he agreed with Kirkland and Pike that was counseling was necessary." (*Id.* ¶ 46 (citing Howard Decl. ¶ 10).)

### ii. 2016 Performance Review

"Pike administered [Smith's] Annual Performance Review for the period of July 1, 2015 to June 30, 2016 ('2016 Performance Review')." (*Id.* ¶ 47 (citing Smith Dep. 184; Mem. Supp. Mot. Summ. J. Ex. O "2016 Performance Review," ECF No. 27-15).) VHDA attaches the 2016

---

"not eligible for overtime pay." (*Id.* ¶ 15 (citing Kirkland Decl. ¶ 8).) Lead Analysts handle "Level 3" support, which are more complex problems than Level 1 or Level 2 problems. (*Id.* ¶¶ 18–19 (citing Kirkland Decl. 12–13).) "Lead Analysts are responsible for developing installation procedures for desktop hardware and software, training Support Analysts on the installation procedures, and researching and testing new hardware and software for the desktop environment." (*Id.* ¶ 19 (citing Kirkland Decl. ¶ 13).)

[12] In her deposition, Smith explains that Cisco Finesse is "[t]he app[lication] that runs the help desk" phone system. (Smith Dep. 170–71.) She states that a VHDA employee "can [only] log in, log out" of the Cisco Finesse application. (*Id.* 170.)

[13] Smith explains that Jabber is "an instant messaging tool" used by VHDA employees. (Smith Dep. 170.)

Performance Review. (2016 Performance Review.) The 2016 Performance Review identified Smith's accomplishments and areas for growth. (*See generally id.*)

For instance, the 2016 Performance Review stated that Smith's "written communications and meeting involvement does not meet expectations." (2016 Performance Review 3.) As an example, it stated that Pike had "spoken several times about email communications not being clear, having limited or no content in the subject, having grammatical errors, spelling, etc." (*Id.*) Regarding Smith's attendance at both internal and external meetings, the 2016 Performance Review stated that Smith "do[es] not want to attend meetings and when [she] do[es] attend a meeting [she] slump[s] in the chair, appear[s] to fall asleep, not involved in the topic." (*Id.*) As to Smith's work, the 2016 Performance Review states that "[a]lthough [Smith is] involved in initiatives, [her] supervisor and manager have to constantly follow-up, tasks completed are past agreed upon due dates, or [she] rush[es] to complete the task at the last minute resulting in poor quality." (*Id.* 5.) It also states that Smith had "to be reminded constantly to complete [her] time sheet. There have been several occasions where [Smith] did not report [her] time correctly. The time sheet will show regular hours but in fact [Smith] used benefit time." (*Id.*)

Smith received an overall rating of "Meets Expectations" on her 2016 Performance Review. (Mem. Supp. Mot. Summ. J. ¶ 48 (citing 2016 Performance Review).) Smith does not dispute that "the written comments on the review warned [her] that she would not receive the same rating in 2017 if she did not show significant improvement in multiple areas." (*Id.* (citing 2016 Performance Review); Resp. Mot. Summ. J. 2.) In her deposition, Smith stated that she "agree[s] with everything" in her 2016 Performance Review. (Mem. Supp. Mot. Summ. J. ¶ 49 (quoting Smith Dep. 185).)

### b.    <u>2017</u>

#### i.    <u>February 2017 Correction Counseling</u>

On February 9, 2017, Smith "left the Service Line unattended without notifying a supervisor or manager and without arranging for coverage with a fellow IT associate." (*Id.* ¶ 50 (citing Howard Decl. ¶ 11; Kirkland Decl. ¶ 33).) "This violated the Service Line Coverage policy" and "Kirkland and Pike's repeated verbal and written instructions to [Smith] regarding proper phone coverage." (*Id.* (citing Kirkland Decl. ¶ 33; Smith Dep. 134; Mem. Supp. Mot. Summ. J. Ex. J "April 2016 Email," ECF No. 27-10; Mem. Supp. Mot. Summ. J. Ex. P "February 2017 Correction Counseling," ECF No. 27-16).) On February 16, 2017, JK Howard and Kirkland "administered Performance Correction Counseling ('February 2017 Correction Counseling') in connection with [Smith's] phone coverage violation," that occurred on February 9, 2017. (*Id.* ¶¶ 50–51 (citing Howard Decl. ¶ 11; Kirkland Decl. ¶ 34; Smith Dep. 134–35).) VHDA attaches the February 2017 Correction Counseling. (Feb. 2017 Correction Counseling.)

Smith alleges that the February 2017 Correction Counseling constituted race and gender discrimination because Ervin Best, a Caucasian male, "frequently left his desk and was not counseled on it." (Mem. Supp. Mot. Summ. J. ¶ 52 (citing Smith Dep. 137).) VHDA states that Best served as "a Lead Analyst, and his job responsibilities often required him to be away from his desk in meetings or servicing customers." (*Id.* (citing Kirkland Decl. ¶ 35).) During her deposition, Smith admitted "that her job did not change as a result of the February 2017 Correction Counseling." (*Id.* ¶ 53 (citing Smith Dep. 137, 202).)

#### ii.    <u>June 2017 Correction Counseling</u>

"In early 2017, [Smith] submitted her bi-annual request to re-certify her Alternate Work Schedule." (*Id.* ¶ 54 (citing Kirkland Decl. ¶ 36).) "She requested to work from home from

7:00–10:00 a.m. on Fridays." (*Id.* (citing Kirkland Decl. ¶ 36).) "Kirkland approved [Smith's] request to work from home every Friday, but modified the time to 7:30–10:30 a.m." (*Id.* (citing Kirkland Decl. ¶ 36).)

VHDA asserts that "Kirkland pushed back [Smith's] requested start time because the Service Line did not accept calls until 7:30 a.m., and VHDA did not have remote work for [Smith] to perform prior to the 7:30 a.m. start time." (*Id.* ¶ 55 (citing Kirkland Decl. ¶ 36; Smith Dep. 160).) VHDA notified Smith "of the approved [Alternate Work Schedule] based on the adjusted times, and she completed and signed a revised [Alternate Work Schedule] form." (*Id.* (citing Kirkland Decl. ¶ 36; Smith Dep. 155–56; Mem. Supp. Mot. Summ. J. Ex. Q "Smith Alternate Work Schedule," ECF No. 27-17).)

When Martin began supervising Smith, "Martin noticed a discrepancy between the documented [Alternate Work Schedule] for [Smith] and the schedule posted by [Smith]." (*Id.* ¶ 56 (citing Kirkland Decl. ¶ 38).) After Martin asked that Kirkland confirm Smith's Alternate Work Schedule, Kirkland "discovered that [Smith] consistently logged into the Service Line around 7:00 a.m., before service calls are supported, and logged out around 10:00 a.m., contrary to her approved" Alternate Work Schedule. (*Id.* ¶ 57 (citing Kirkland Decl. ¶ 38).) "Kirkland also reviewed [Smith's] timesheets and discovered that she was submitting her hours as 7:30–10:30 a.m." (*Id.* (citing Kirkland Decl. ¶ 38).)

"On June 14, 2017, Kirkland and Martin administered Performance Correction Counseling for [Smith's] failure to work the approved . . . Alternate Work Schedule ('June 2017 Correction Counseling')." (*Id.* ¶ 58 (citing Kirkland Decl. ¶ 39; Smith Dep. 161; Mem. Supp. Mot. Summ. J. Ex. R "June 2017 Correction Counseling," ECF No. 27-18).) VHDA attaches the June 2017 Correction Counseling. (June 2017 Correction Counseling.) VHDA states that Smith

"got up and left without verbalizing any request for a break or a request to reschedule the meeting" to discuss the 2017 Correction Counseling. (Mem. Supp. Mot. Summ. J. ¶ 58 (citing Kirkland Decl. ¶ 39; June 2017 Correction Counseling 1).) It also asserts that "JK Howard approved the decision to counsel" Smith. (*Id.* (citing Howard Decl. ¶ 12).)

During her deposition, Smith admitted "that her job did not change as a result of the June 2017 Correction Counseling." (*Id.* ¶ 59 (citing Smith Dep. 202).)

Smith states that male employees "had more options for Alternative Work Schedules than she did." (*Id.* ¶ 60 (citing Smith Dep. 146).) During her deposition, Smith identified three male employees who had more options for Alternative Work Schedules: (1) Ervin Best, a Caucasian male; (2) Ted Daneker, a Caucasian male; and, (3) Wai Tsang, an Asian-American male. (*Id.* (citing Smith Dep. 147).) Best, Daneker, and Tsang all served as Lead Analysts, a position two levels above Smith's position. (*Id.* ¶¶ 14, 20 (citing Kirkland Decl. ¶¶ 6, 14).) In her deposition, "[w]hen asked why Lead Analysts had more [Alternate Work Schedule] options, [Smith] responded that it 'had to do with their titles.'"[14] (*Id.* ¶ 60 (citing Smith Dep. 147).)

### iii. 2017 Performance Review

"Martin administered [Smith's] Annual Performance Review for the period of July 1, 2016 to June 30, 2017 ('2017 Performance Review')." (*Id.* ¶ 61 (citing Smith Dep. 190; Mem. Supp. Mot. Summ. J. Ex. S "2017 Performance Review," ECF No. 27-19).) VHDA attaches Smith's 2017 Performance Review. (2017 Performance Review.) "JK Howard reviewed and approved the 2017 Performance Review." (Mem. Supp. Mot. Summ. J. ¶ 61 (citing Howard

---

[14] Although she does not list it as one of her disputed facts, during her deposition, Smith testified that all of the Service Central employees at the particular location of VHDA at which she worked performed the same job functions. For instance, she stated that when the members of Service Central "did a refresh, you couldn't take vacation, whether you were a Level 1, 2 or 3. You couldn't take vacation because we had to building laptops for the entire" VHDA. (Smith Dep. 32–33.) As explained below, because Smith submits only her own declarations in support of that position, this does not constitute a genuine dispute of material fact.

Decl. ¶ 13).) Smith "received an overall rating of 'Fair But Needs Improvement.'" (*Id.* (citing 2017 Performance Review).) Similar to her prior performance reviews, the 2017 Performance Review provided several areas in which Smith could improve. (*See generally* 2017 Performance Review.)

For instance, it rated Smith as "Unsatisfactory" for "Administrative Responsibilities" noting her "[f]ailure to accurately and timely complete timesheets; [f]ailure to work assigned Alternative Work Schedule; [and] [u]nprofessional communications." (Mem. Supp. Mot. Summ. J. ¶ 62 (quoting 2017 Performance Review).) Similarly, it rated her "Service Delivery" as "Fair But Needs Improvement." (*Id.* (quoting 2017 Performance Review).) In this section, Martin noted Smith's "[e]xcessive use of personal cell phone during work time." (*Id.* (quoting 2017 Performance Review).)

In her deposition, Smith stated that the 2017 Performance Review was "totally bogus and not true." (*Id.* ¶ 63 (quoting Smith Dep. 190).) "As a result of the 'Fair But Needs Improvement' rating on the 2017 Performance Review, [Smith] was not eligible for a bonus or merit increase." (*Id.* ¶ 64 (citing Smith Dep. 138–39).) Her job did not otherwise change as a result of the 2017 Performance Review. (*Id.* (citing Smith Dep. 202).)

### iv.    Smith's 2017 "Letter of Grievance"

"On July 5, 2017, [Smith] provided VHDA with a 'Letter of Grievance,' alleging harassment and unfair treatment by Kirkland." (*Id.* ¶ 65 (Burke Decl. ¶ 9; Smith Dep. 238; Mem. Supp. Mot. Summ. J. Ex. T "Letter of Grievance," ECF No. 27-20).) VHDA attaches Smith's Letter of Grievance. (Letter of Grievance.) In the letter, Smith "stated that Kirkland limited [Smith's] work opportunities to phone and printer support and gave her lesser quality work as compared to 'the rest of [her] coworkers.'" (Mem. Supp. Mot. Summ. J. ¶ 65 (quoting

Letter of Grievance).) VHDA contends, and Smith does not dispute, that her "letter did not specifically name any coworkers who were treated more favorably, but she says she was referring to the Lead Analysts." (*Id.* (Smith Dep. 250); Resp. Mot. Summ. J. 2.) Similarly, Smith does not dispute VHDA's position that her "letter did not mention race, gender, or retaliation." (Mem. Supp. Mot. Summ. J. ¶ 65 (citing Letter of Grievance; Smith Dep. 249); Resp. Mot. Summ. J. 2.)

### v. Smith's Appeal of Her 2017 Performance Review and VHDA's Subsequent Investigation

"In August[] 2017, [Smith] provided VHDA with a second letter—this one appealing her 2017 Performance Review and requesting that her rating be adjusted upward." (Mem. Supp. Mot. Summ. J. ¶ 66 (citing Burke Decl. ¶ 10; Smith Dep. 193; Mem. Supp. Mot. Summ. J. Ex. U "August 2017 Letter," ECF No. 27-21).) Again, Smith does not dispute VHDA's characterization that her "performance appeal did not mention race, gender, retaliation, or harassment." (*Id.* (citing Burke Decl. ¶ 11; Aug. 2017 Letter).)

On August 10, 2017, VHDA hired Tammy Jackson, an African-American female, "of Positive Impact Consulting, an independent human resources consulting company, to investigate [Smith's] grievance and performance appeal." (*Id.* ¶ 67 (Burke Decl. ¶ 12; Smith Dep. 241–42).) "As a part of her investigation, Jackson reviewed documentation relative to [Smith's] performance and interviewed:" (1) Smith; (2) Kohan, Smith's supervisor at VHDA from 2006 to 2011; (3) JK Howard, the Managing Director of Information Technology Service and Smith's direct supervisor from 2012 to 2013; (4) Kirkland, Smith's supervisor; (5) Pike, Smith's direct supervisor; (6) Nate Hostetter, a Human Resources employee; (7) Amy Burke, another Human

Resources employee; and, (8) Marco Howard, a Senior Desktop Support Analyst.[15] (*Id.* (citing Burke Decl. ¶ 13; Burke Decl. Ex. A "Positive Impact Consulting Report," ECF No. 27-1).)

After her investigation, "Jackson concluded that (1) [Smith's] 2017 Performance Review rating was justified; and (2) Kirkland was not engaging in harassment or unfair treatment of [Smith]." (*Id.* ¶ 68 (citing Positive Impact Consulting Report).) "VHDA informed [Smith] about Jackson's conclusions, but did not provide her with a copy of Jackson's written report." (*Id.* ¶ 69 (Burke Decl. ¶ 14).) VHDA maintains that "[t]his is consistent with VHDA's usual practice when it comes to sharing the results of an independent investigation with a complaining employee." (*Id.* (citing Burke Decl. ¶ 14).)

### vi. November 2017 Correction Counseling and Individualized Development Plan

"On November 13, 2017, [JK] Howard and Martin administered Performance Correction Counseling ['November 2017 Performance Counseling'] and an Individual Development Plan for" Smith. (*Id.* ¶ 70 (citing JK Howard Decl. ¶ 15; Kirkland Decl. ¶ 41; Smith Dep. 197, 204).) VHDA attaches the November 2017 Performance Counseling and Individual Development Plan

---

[15] Smith testified at her deposition that all Service Central employees performed the same job functions. She presents no evidence to support this. VHDA explains, and provides evidence to show, that a Senior Desktop Support Analyst is a different position than the position Smith held as a Desktop Support Analyst. (*See* Mem. Supp. Mot. Summ. J. ¶¶ 14, 15 (citing Kirkland Decl. ¶¶ 6, 7).) VHDA states that "[t]he Senior Desktop Support Analyst position was a promotion in terms of title, pay, and responsibilities from the Desktop Support Analyst position, and the Lead Analyst position was a promotion in terms of title, pay, and responsibilities from the Senior Desktop Support Analyst position." (*Id.* ¶ 15 (citing Kirkland Decl. ¶ 7).) Similar to a Lead Desktop Support Analyst and unlike Smith, Senior Desktop Support Analysts "were exempt employees, paid on a salary basis and not eligible for overtime pay." (*Id.* ¶ 15 (citing Kirkland Decl. ¶ 8).) VHDA further explains that when a Desktop Support Analyst, such as Smith, "is unable to resolve a problem either due to insufficient expertise or insufficient time, they are expected to escalate the problem to a Senior Desktop Analyst for more complex and time-intensive 'Level 2' support." (*Id.* ¶ 18 (citing Kirkland Decl. ¶ 12; Mem. Supp. Mot. Summ. J. Ex. H "Desktop Support Analyst Job Description," ECF No. 27-8).) "If or when the Senior Desktop Support Analyst is unable to resolve a problem, they similarly escalate it to a Lead Analyst for even more complex 'Level 3' support." (*Id.* ¶ 19 (citing Kirkland Decl. ¶ 13).)

that it issued to Smith. (Mem. Supp. Mot. Summ. J. Ex. V "November 2017 Performance Counseling," ECF No. 27-22; Mem. Supp. Mot. Summ. J. Ex. W "Individual Development Plan," ECF No. 27-23.)

In the November 2017 Performance Counseling, VHDA placed Smith "on probation for [sixty] days 'as a result of her poor verbal and writing communication, unprofessional attitude and actions, administrative errors, as well as lack of knowledge and poor quality of work.'" (Mem. Supp. Mot. Summ. J. ¶ 71 (citing JK Howard Decl. ¶ 15; Nov. 2017 Performance Counseling 7).)

The November 2017 Performance Counseling identified a number of examples, two of which include that

> [Smith] forwarded work calls to her personal cell phone after being directed to stop this practice. The forwarding of calls to a number with a different area code created confusion among customers attempting to reach Service Central.

> [Smith] frequently assigned tickets to the incorrect [Information Technology Services] team, sent emails without content or explanation, and failed to submit timely and accurate time sheets.

(*Id.* ¶ 72 (quoting Nov. 2017 Performance Counseling 2–7).) Smith's Individual Development Plan "identified specific steps and requirements to improve the performance categories of communication [and] professionalism, knowledge [and] quality of work, and administrative duties." (*Id.* ¶ 73 (citing Individual Development Plan).)

In her deposition, Smith stated "that her job did not change as a result of the November 2017 Correcting Counseling and" Individual Development Plan. (*Id.* ¶ 74 (citing Smith Dep. 137).)

### c. Smith's 2018 Resignation

"In May 2018, [Smith] took approved medical leave under the Family and Medical Leave Act ('FMLA')." (*Id.* ¶ 76 (citing Burke Decl. ¶ 15).) "While on FMLA leave, [Smith] voluntarily resigned her employment with VHDA." (*Id.* ¶ 77 (citing Burke Decl. ¶ 16; Smith Dep. 253–54).) In a June 8, 2018 email, Smith "wished her VHDA colleagues a 'fond farewell' and stated that she was looking forward to a 'new position' that would present 'new challenges' and 'add[] a diverse experience' to her resume." (*Id.* ¶ 78 (citing Smith Dep. 254; Mem. Supp. Mot. Summ. J. Ex. X "June 8, 2018 email," ECF No. 27-24).)

### 4. Smith's Discrimination Claim

On December 7, 2017, approximately six months prior to her resignation and after her 2017 Letter of Grievance and her appeal of her 2017 Performance Review, Smith "filed a Charge of Discrimination with the Equal Employment Opportunity Commission ('EEOC Charge')" alleging race and gender discrimination and retaliation. (*Id.* ¶ 79–80 (citing Smith Dep. 14; Mem. Supp. Mot. Summ. J. Ex. Y "EEOC Charge," ECF No. 27-25).) "After the EEOC made no finding, [Smith] sought and received a right-to-sue letter." (*Id.* ¶ 79 (citing Compl. ¶¶ 53–54).)

VHDA states that "[t]he factual allegations in [Smith's] Complaint . . . are nearly a copy-and-paste of her EEOC Charge." (*Id.* ¶ 80 (comparing Compl. with EEOC Charge).) VHDA asserts that "[d]uring discovery, [Smith] made no written discovery requests, and did not depose a single witness." (*Id.*)

Smith makes several allegations of discrimination, including the seating chart Kirkland imposed, a day in which VHDA asked her and another African-American employee to work, and the lunch schedule imposed by Kirkland.

a.    **Seating Chart**

In or around the summer of 2016, Smith "alleges that . . . Kirkland discriminated against her when she 'redid the seating chart' for Service Central staff in connection with the group moving to a different part of the office." (*Id.* ¶ 83 (quoting Smith Dep. 86–88).)

"The new seating arrangement had [Smith], [Dannel] Jackson, [an African-American male], M[arco] Howard (*i.e.,* the Support Analysts) in one row of cubicles, and Best, Tsang, and Daneker (*i.e.*, the Lead Analysts) in an adjacent row of cubicles. (*Id.* ¶ 84 (citing Smith Dep. 91– 92; Mem. Supp. Mot. Summ. J. Ex. Z "Seating Chart," ECF No. 27-26).) Smith, Jackson, and Marco Howard are all African-American. (*Id.* ¶ 20.) Best and Daneker are Caucasian and Tsang is Asian-American. (*Id.* (citing Kirkland Decl. ¶ 14; Smith Dep. 47; Information Technology Services Organization Chart).) "As Kirkland explained to [Smith] around the time of the new seating arrangement, the seats were organized by job titles and the corresponding level of IT support being offered to customers." (*Id.* ¶ 84 (citing Kirkland Decl. ¶ 43; Smith Dep. 87–88, 100–01).)

Smith "asserts that the seating arrangement '[had] nothing to do with a [job] title' because at the end of the Support Analysts' row sat Najla Craddock, an African-American System Administrator, and at the end of the Lead Analysts' row sat Renee Lacy, a Caucasian System Administrator." (*Id.* ¶ 85 (citing Smith Dep. 87, 95–96).) VHDA maintains that "[t]he location of Lacy's and Craddock's cubicles had to do with Kirkland's desire to create some physical distance between Lacy and a good friend with whom Lacy tended to socialize excessively during work hours." (*Id.* (citing Kirkland Decl. ¶¶ 44–45).)

VHDA avers that "[t]he cubicle wall separating [Smith] from Jackson was the same height as the cubicle wall separating her from Best." (*Id.* ¶ 86 (citing Smith Dep. 90).) In her

deposition, Smith "admits she was seated closer to Best and Tsang than to JK Howard or

Craddock." (*Id.* (citing Smith Dep. 91).) Smith also "admits that the Lead Analysts' cubicles

were not any more desirable than the Support Analysts' cubicles" and that "the worst part of the

move—*i.e.,* 'sitting out in the open' instead of 'behind closed doors'—impacted everyone in

Service Central equally." (*Id.* ¶ 87 (citing Smith Dep. 87, 92–94).)

<h4 style="text-align:center">b.     <u>Snow Day</u></h4>

On January 9, 2017, "VHDA closed its offices . . . due to inclement weather." (*Id.* ¶ 88

(citing Kirkland Decl. ¶ 46).) Smith "alleges that she and Harrison," another African-American

female VHDA employee, "were the only Service Central employees required to work from home

on that day." (*Id.* (citing Smith Dep. 147–54).)

On January 5, 2017, prior to the day VHDA closed due to weather, JK Howard, as the

Managing Director of Information Technology Services, "sent an email to all of [Information

Technology Services] stating:"

> If the weather models are correct, there may be snow this weekend that will affect
> Virginia. . . . In the event of any impact to VHDA's offices or systems, you will
> be notified. Make sure to take your laptop home on Thursday evening. . . .
>
> One of the things that has changed over the years is that the business works when
> the building is closed. Because we are support division, we need to look at a
> building closure as a work day. Please see your manager for expectations based
> on the area(s) you support.

(*Id.* ¶ 89 (citing Smith Dep. 149; Mem. Supp. Mot. Summ. J. Ex. AA "January 5, 2017 Email,"

ECF No. 27-27; JK Howard Decl. ¶ 17).) Smith "remembers receiving JK Howard's email, and

admits that VHDA instructed all Service Central employees to take their laptops home and work

from home if the office was closed due to weather." (*Id.* ¶ 90 (citing Smith Dep. 150).)

On the day that VHDA closed, January 9, 2017, at 5:42 a.m., "Pike sent an e-mail to

[Smith], Harrison, and Jackson, carbon-copying Daneker, Tsang, and [Best], and instructing that

'Service Central would be operating as usual and other teams would be available for support."
(*Id.* ¶ 91 (citing Mem. Supp. Mot. Summ. J. Ex. BB "January 9, 2017 Email," ECF No. 27-28).)
"Pike's e-mail specifically instructs Jackson to take a shift on the Service Line, and it further
states that if the Support Analysts need anything from the Lead Analysts, they should call them."
(*Id.* (citing Jan. 9, 2017 Email).)  VHDA maintains that "VHDA records show that Jackson,
M[arco] Howard, Best, Daneker, and Tsang all worked from home on January 9, 2017." (*Id.*
(citing Kirkland Decl. ¶ 46).)

### c. Scheduled Lunch

Smith also alleges that "her scheduled lunch hour was race-based discrimination by
Kirkland because white employees did not have a scheduled lunch period." (*Id.* ¶ 93 (citing
Compl. ¶ 14; Smith Dep. 143–46).)  In her deposition, Smith "admits . . . that the four
individuals responsible for covering the Service Line—*i.e.,* [Smith], Harrison, M[arco] Howard,
and Jackson—were all required to take scheduled lunch breaks in order to maintain proper phone
coverage." (*Id.* (citing Smith Dep. 145–46; Mem. Supp. Mot. Summ. J. Ex. K "November 2,
2016 Email," ECF No. 27-11).)

### 5. Smith's Retaliation Claim

In addition to her race and gender discrimination claims, Smith also alleges that VHDA
retaliated against her for complaining about the discrimination she faced.

"In or around June 2015, [Smith] complained to Kirkland about the new staffing model
that required [Smith] to provide 'primary' coverage on the Service Line." (*Id.* ¶ 94 (citing Smith
Dep. 206–08; Kirkland Decl. ¶ 47).)  Smith does not dispute that "[s]pecifically, [she] asked
Kirkland, 'What are they going to do while we answer the phone calls?'" (*Id.* (citing Smith Dep.
207); Resp. Mot. Summ. J. 2.)  Smith also does not dispute that she stated that "the 'we' referred

to Support Analysts and the 'they' referred to Lead Analysts." (*Id.* (citing Smith Dep. 208); Resp. Mot. Summ. J. 2.) VHDA asserts that Smith "did not say anything about race or gender in her conversation with Kirkland." (*Id.* (citing Smith Dep. 208, 217–18; Kirkland Decl. ¶ 47).)

In late 2015 and early 2016, Smith "alleges that she had two conversations with Pike . . . where she told him that she felt she was being harassed because of her race." (*Id.* ¶ 95 (citing Smith Dep. 217–21).) Smith does not dispute that "she complained to Pike that the Support Analysts were 'worker bees' while the Lead Analysts 'relax and do nothing.'" (*Id.* (citing Smith Dep. 217).) Smith also does not dispute that in her deposition she "admit[ed] that Pike did not retaliate against her after these complaints." (*Id.* (citing Smith Dep. 218, 221).)

In June or July 2016, Smith "complained to Burke in Human Resource[s]." (*Id.* ¶ 96 (citing Smith Dep. 221, 226–27).) "The purpose of the meeting with Burke was to discuss a time-off request submitted by [Smith] and rejected by Pike." (*Id.* (citing Burke Decl. ¶ 17; Smith Dep. 103–06, 225).) During the meeting, Smith "told Burke that Pike and Kirkland were racist" and "that she was being discriminated against on the basis of her gender because 'they don't help me out when I have stuff to lift.'" (*Id.* ¶¶ 96–97 (citing Smith Dep. 227, 229).)

Smith does not contest that she "did not complain to anyone other than Burke about gender discrimination." (*Id.* ¶ 97 (citing Smith Dep. 269); Resp. Mot. Summ. J. 2.)

Smith also does not contest that she "is not able to identify a specific date on which Kirkland retaliated against her after she allegedly complained to Burke." (Mem. Supp. Mot. Summ. J. ¶ 98 (citing Smith Dep. 214–15); Resp. Mot. Summ. J. 2.) "As for the type of retaliation she experienced, [Smith] cites the multiple 'correction write-ups' she received from Kirkland in 2016 and 2017." (Mem. Supp. Mot. Summ. J. ¶ 98 (citing Smith Dep. 234–35, 268–69).)

**B.    The Facts Smith Disputes**

With the factual background as presented by VHDA in mind, the Court now turns to those facts that Smith disputes. In response to the Motion for Summary Judgment, Smith does not dispute many of VHDA's facts, although she alleges that "some undisputed facts are not relevant to the motion for summary judgment." (Resp. Mot. Summ. J. 2.) In her Response to the Motion for Summary Judgment, Smith lists ten facts that she disputes. In support of those disputes, Smith only points to her deposition and submits two of her own declarations. She also attaches to one of her declarations an unsigned copy of her answers to VHDA's Interrogatories and a chart showing the seating chart she alleges to be discriminatory.

Smith first disputes that "she was often away from her job duties on personal matters." (*Id.* 3.) She states that "she was often away from the telephone to attend to one of her job duties: installation of printers and check on the voltage of printers." (*Id.*)

Second, Smith states that "[t]o the extent that [she] was occasionally away from the telephone, that was not the case more often than . . . Best . . . a Lead Desk[t]op Support Analyst, whose job duties as to telephone coverage were comparable to Smith's duties." (*Id.*)

Third, Smith disputes VHDA's assertion that "Smith was the lowest performing employee doing the work that she was doing." (*Id.* 4.) Smith states that "she was the highest performing employee, that, in fact, she handled more telephone calls than any employee doing the same work during the period in question." (*Id.*)

Fourth, Smith disputes VHDA's allegations "that during a period beginning in 2015, Smith falsified time records, was frequently away from her post without giving any explanation, and acted frequently in an unprofessional and insubordinate manner." (*Id.*) Looking to her 2017 Performance Review, Smith maintains that she "met VHDA's expectations." (*Id.*) In her

declaration, Smith also "sets forth in detail how Kirkland's and Howard's declarations are wrong in their statements regarding Smith's job performance." (*Id.*)

Fifth, Smith disputes Kirkland's reasoning for creating the seating chart in which the African-American employees sat down one row and the Caucasian and Asian-American employees sat down another row. Smith asserts that Kirkland's reasoning—that the she arranged the employees by job title and that she placed an additional employee with a different job title at the end of each row to separate another employee from a friend—"made no sense because [Kirkland] could have achieved integration of the work force by placing that employee with the African-American employees while placing the African-American employee in line with the white employees." (*Id.* 4–5.)

Sixth, Smith disputes VHDA's assertion that "VHDA records showed that Smith spent [twenty-six] hours in personal telephone time in a period of five months." (*Id.* 5.) Smith maintains "[t]hat comes to 1.8% of her work time or less than ten (10) minutes a day on personal phone time at work." (*Id.*) "Smith disputes that this constituted excessive time on personal phone calls." (*Id.*)

Seventh, looking to VHDA's contention that Best left his desk to attend to his work duties, Smith states that "Best left his post for personal discussions with a co-worker much more often tha[n] she left her post." (*Id.*) She further states that she left her desk "to attend to customers and to perform her duties related to printers," while Best "left his post much more often without cause." (*Id.*) She maintains that "she faced management discipline in the form of counseling and effect on her evaluations, without cause, while the white employee, who gave cause, escaped any discipline." (*Id.*)

Eighth, turning to the snow day allegations, Smith disputes that other Service Central employees had to work from home that day. She maintains that "she was required to work from home but the white employees and the Asian employee were not required to do so." (*Id.*)

Ninth, Smith disputes VHDA's contention that she "never complained to Howard of race discrimination." (*Id.*) She asserts that "she personally complained to Howard of race discrimination in May or June of 2016."[16] (*Id.* 6.)

Finally, Smith disputes that she reported to Pike or Martin instead of reporting directly to Kirkland. She maintains that she "reported directly to Kirkland, who, regardless of what was on paper, directly supervised Smith." (*Id.*)

## II. Standard of Review: Motion for Summary Judgment

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Liberty Lobby*, 477 U.S. at 248–50.

"A fact is material if the existence or non-existence thereof could lead a jury to different resolutions of the case." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 628 (E.D. Va. 2016) (citing *Liberty Lobby*, 477 U.S. at 248). Once a party has properly filed evidence supporting its motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial. *Celotex*

---

[16] In her Response, Smith later asserts that "there is a dispute in the facts as to whether Smith complain[]ed about race discrimination to Howard in May or June of 2017." (Resp. Mot. Summ. J. 12.) The declaration Smith submitted in support of her contention states that she complained to Howard in May or June 2016. (Nov. 29, 2016 Smith Decl. 8, ECF No. 28-2.) Because Smith's declaration constitutes a sworn statement and her pleadings do not, the Court will assume this complaint may have taken place in 2016.

*Corp.*, 477 U.S. at 322–24. The parties must present these in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c). Important to this case, a Title VII plaintiff cannot create a dispute of material fact regarding his or her job performance by relying on his or her testimony alone. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Macon v. Dupont*, No. 3:10cv260, 2011 WL 4925083, at *8 (E.D. Va. Oct. 17, 2011) (citations omitted). Similarly, the United States Court of Appeals for the Fourth Circuit "generally consider[s] self-serving opinions without objective corroboration not significantly probative." *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Liberty Lobby*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

In the end, the non-moving party must do more than present a scintilla of evidence in its favor.

> Rather, the non-moving party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant, for an apparent dispute is not genuine within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the facts in his [or her] favor.

*Sylvia Dev. Corp.*, 48 F.3d at 818 (internal quotations, citations, and alterations omitted). The ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the

[nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

## III. Analysis

### A. Many of Smith's Allegations Are Time-Barred

VHDA asserts that many of Smith's allegations are barred by the applicable statute of limitations. Smith does not respond to this argument in her Response to the Motion for Summary Judgment, but at the January 16, 2020 Hearing, Smith stated that her 2017 Performance Review constitutes the adverse action that supports her claims. She explained that she provided the additional information as background.

Looking to the applicable statute of limitations, when considering Smith's Title VII claims, the Court may consider Smith's allegations that occurred on or after February 10, 2017. Similarly, when considering Smith's Title VI and § 1981 claims, the Court may only consider Smith's allegations that occurred on or after December 12, 2016.

### 1. Legal Standard: Applicable Statutes of Limitation

For the Court to consider alleged acts of discrimination under Title VII those acts must have occurred within the applicable limitations period. *Gilliam v. S.C. Dep't. of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007). When the plaintiff files her charge with her state's employment discrimination agency—such as the Virginia Division on Human Rights—the limitations period for filing a Title VII claim with the Equal Employment Opportunity Commission ("EEOC") is 300 days from the allegedly discriminatory action. 42 U.S.C. § 2000e-5(e)(1); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). "Any discrete acts of discrimination that occurred prior to the applicable period are procedurally barred and

cannot be used as a basis for recovery." *Gilliam*, 474 F.3d at 139. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. A Title VII plaintiff may, however, "us[e] the prior acts as background evidence in support of a timely claim." *Id.*

A statute of limitations similarly applies to claims brought under Title VI and 42 U.S.C. § 1981. The statute of limitations for claims brought pursuant to these two statutes is two years. *Williams v. Enter. Leasing Co. of Norfolk/Richmond*, 911 F. Supp. 988, 998 (E.D. Va. 1995) ("The plaintiff's claims under Section 1981 are subject to the two-year year Virginia statute of limitation for personal injury."); *Taylor v. CVS, Inc.*, No. 3:16cv171, 2018 WL 3371043, at *2 (E.D. Va. July 10, 2018) ("A plaintiff must bring a Tile VI claim within two years of the action accruing.").

### 2. Based on these Statutes of Limitation, Many of Smith's Allegations are Time-Barred

The statutes of limitations preclude Smith from bringing a discrimination claim based solely on many of the alleged discriminatory actions she faced while employed at VHDA. She may, however, utilize these time-barred actions as background for her timely allegations. Because Smith filed her EEOC Charge on December 7, 2017, Smith cannot base her Title VII charges on any events that occurred prior to February 10, 2017—300 days prior to the day on which Smith filed her EEOC Charge. *Tinsley*, 155 F.3d at 439; *Gilliam*, 474 F.3d at 139. She also cannot base her Title VI and § 1981 charges, on conduct that occurred prior to December 12, 2016—two years before she filed her Complaint. *Williams,* 911 F. Supp. at 998; *Taylor,* 2018 WL 3371043, at *2.

Because Smith states that Kirkland implemented the seating chart "in or around the summer of 2016," this event cannot form the basis of any of Smith's charges. (Mem. Supp. Mot.

Summ. J. ¶ 83 (citing Smith Dep. 86–88); Resp. Mot. Summ. J. 2.) Similarly, Smith's

allegations regarding Kirkland and Pike's counseling her on the amount of time she spent on

personal telephone calls cannot serve as the basis of any of her claims because Kirkland and Pike

issued this counseling "in or around June 2016." (Mem. Supp. Mot. Summ. J. ¶ 41 (citing Smith

Dep. 110).) Relatedly, Smith's allegations regarding the snow day on which VHDA allegedly

required her to work when allowing other Service Central employees not to work cannot form

the basis of her Title VII claims because Smith states that this snow day occurred on January 9,

2017. (*Id.* ¶ 88 (citing Kirkland Decl. ¶ 46); Resp. Mot. Summ. J. 2.)

Given the applicable statutes of limitation, Smith may support her Title VII charges with

conduct that occurred after February 10, 2017. She may support her Title VI and § 1981 charges

with conduct that occurred after December 12, 2016. These allegations include her February

2017 Correction Counseling, her 2017 Performance Review, her Letter of Grievance, and appeal

of her 2017 Performance Review, as well as her Individual Development Plan. Considering

these allegations not barred by the statutes of limitations, VHDA is entitled to summary

judgment on Smith's remaining charges. The Court would reach the same result even if it

considered all of Smith's allegations.

**B.** **The Court Will Grant VHDA Summary Judgment on Smith's Race and Gender Discrimination Claims**

In each of the remaining counts of the Complaint, Smith alleges that VHDA subjected

her to discrimination based on her race or gender. Although she brings her claims under three

different statutes, the result is the same under each statute.

**1.** **Legal Standard: Discrimination Claims**

Smith brings her gender and race discrimination claims under Title VII, Title VI, and 42

U.S.C. § 1981. The Court utilizes the same legal standard to analyze gender and race claims

under each of these statutes. *Middlebrooks v. Univ. of Md.*, 166 F.3d 1209, at *4 (4th Cir. 1999) (unpublished) (table decision) (stating that Title VI and § 1981 claims "are appropriately analyzed under the Title VII proof scheme, first articulated in *McDonnell Douglas Corp. v. Green.*")

Title VII states that employers cannot "discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment because of such individual's" race or gender. 42 U.S.C. § 2000e-2(a)(1). Title VI similarly states, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Finally, 42 U.S.C. § 1981 states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

Disparate-treatment claims are the most "easily understood type of discrimination"—the employer "simply treats some people less favorably than others" because of a protected status. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). "A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 877, 986 (1988)).

When no direct evidence of discriminatory intent exists,[17] the plaintiff must proceed under the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this standard, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of race or gender discrimination a plaintiff must establish: (1) that he or she is a member of a protected class, (2) that his or her job performance was satisfactory, (3) that he or she was subject to an adverse employment action by his or her employer and (4) that similarly situated employees outside of his or her protected class received more favorable treatment. *See McDonnell Douglas*, 411 U.S. at 802; *see Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (applying similar factors to a Title VII gender discrimination claim). Courts have also articulated the second element as "at the time the employer took the adverse employment action he [or she] was performing at a level that met his employer's legitimate expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citing *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (4th Cir. 1999)). After the plaintiff establishes this prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

### 2. Smith Cannot Show that She Met VHDA's Legitimate Expectations

Although Smith satisfies the first element of a prima facie case of race or gender discrimination, she has failed to show that she satisfies the second element—that her job

---

[17] Smith does not argue that she has produced direct evidence of discrimination. (*See generally* Resp. Mot. Summ. J.) Because Smith submitted only her own declarations in support of her Response to the Motion for Summary Judgment, even if Smith claimed that she did present such evidence, the Court would find that no direct evidence existed. *Evans*, 80 F.3d at 959 (stating that plaintiff's "own naked opinion, without more, is not enough to establish a *prima facie* case of [] discrimination" (quoting *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988)).

performance was satisfactory. Therefore, VHDA is entitled to summary judgment on these counts.

As an African-American woman, Smith belongs to two protected classes and meets the first element to establish a prima facie case of gender or race discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Bonds*, 629 F.3d at 386. However, she has not shown that she was performing at a level that met VHDA's legitimate expectations at the time of her 2017 Performance Review, the adverse employment action that she contends undergirds her claim.[18] In deciding whether Smith has satisfied this element, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960–61 (internal quotation marks and citations omitted).

VHDA has submitted a great deal of evidence in support of its contention that throughout her employment at VHDA Smith struggled to meet VHDA's legitimate expectations. For instance, it asserts—and provides documentary evidence to show—that VHDA counseled Smith both formally and informally throughout her approximately twelve years of employment and that many of the problems persisted over time.

First, VHDA counseled Smith on at least four occasions about how her demeanor could be construed as unprofessional, including her difficulty relating to her co-workers. (*See* 2012 Performance Review 5; 2016 Performance Review 3; Nov. 2017 Correction Counseling 3–4, 7; Individual Development Plan 7.) It also counseled her, as a non-exempt employee who it paid on an hourly basis, on at least four occasions about the importance of inputting her time correctly. (Dec. 2013 Correction Counseling 1; 2016 Performance Review 5; June 2017 Correction Counseling 2–4; Individual Development Plan 5, 8.)

---

[18] As explained below, Smith also has not shown that VHDA subjected her to an adverse employment action.

Second, beginning in at least 2013, VHDA submits evidence to show that "JK Howard administered Performance Correction Counseling for" Smith, which "identified '[c]ommunications, responsibility, judgment, leave tracking, customer service and core duties' as areas where [Smith] needed to show improvement." (Mem. Supp. Mot. Summ. J. ¶ 36 (quoting 2013 Correction Counseling 1).)

Third, the record also shows that in February 2017 VHDA counseled Smith regarding leaving the Service Line unattended. (*See* Feb. 2017 Correction Counseling.) Finally, VHDA's evidence shows that on June 14, 2017, "Kirkland and Martin administered Performance Correction Counseling for [Smith's] failure to work the approved . . . Alternate Work Schedule." (Mem. Supp. Mot. Summ. J. ¶ 58 (citing June 2017 Correction Counseling).)

In addition to the Correction Counseling VHDA gave to Smith, Smith's annual Performance Reviews document a history of performance problems which mirror those addressed through counseling. VHDA submits Smith's 2016[19] and 2017 Performance Reviews, which identify a number of areas in which Smith could improve as an employee. (*See* 2016 Performance Review; 2017 Performance Review.) These areas include her oral and written

---

[19] Smith contends that the evidence does not show that she failed to meet VHDA's legitimate job expectations at the time of her 2017 Performance Review. Smith looks specifically to her 2016 Performance Review in which Pike rated Smith as "Meets expectations." (*See* 2016 Performance Review.)

Although Smith correctly identifies that she received a favorable rating on her 2016 Performance Review, she fails to acknowledge the written feedback contained in that review. For instance, in the Developmental category, her review states: "[i]n [Fiscal Year] 17 a rating of Fair But Needs Improvement will be given if you do not obtain at least 26 hours of training related to your job and provide your supervisor with the number of hours for each training session." (*Id.* 2.) It also states in the Objective category, for which she received a "Fair but needs improvement" rating, that "[t]o receive a Meets Expectation in [Fiscal Year] 17 there will need to be a significant improvement in written communication, active involvement in meeting as well as professional demeanor. All written communication will need to be your original work." (*Id.* 3–4.) This written feedback—which constitutes only a small portion of the written feedback contained in the 2016 Performance Review—establishes that although Smith received an overall positive rating, Smith's performance as an employee required improvement in several areas.

communication, her demeanor during meetings, and the requirement that her "supervisor and manager have to constantly follow-up, tasks completed are past agreed upon due dates," and that she submitted poor quality work. (2016 Performance Review 5.) These problems persisted in her 2017 Performance Review in which VHDA rated Smith as "Unsatisfactory" for "Administrative Responsibilities" noting her "[f]ailure to accurately and timely complete timesheets; [f]ailure to work assigned Alternative Work Schedule; [and] [u]nprofessional communications." (Mem. Supp. Mot. Summ. J. ¶ 62 (quoting 2017 Performance Review).) Similarly, it rated her "Service Delivery" as "Fair But Needs Improvement." (*Id.*) In this section, Smith's 2017 Performance Review reflected her "[e]xcessive use of personal cell phone during work time." (*Id.*)

In response to the evidence submitted by VHDA, Smith offers two of her own declarations. She also attaches to one declaration an unsigned copy of her answers to VHDA's Interrogatories and a chart showing the seating arrangement she alleges to be discriminatory. In the first declaration, Smith describes the seating chart Kirkland implemented and the impact that it had on her. (*See* Nov. 15, 2019 Smith Decl. ¶¶ 6–7, 10, ECF No. 28-1.) In the second declaration, Smith identifies those paragraphs of Kirkland and Howard's declarations with which she disagrees. (*See* Nov. 29, 2019 Smith Decl., ECF No. 28-2.) Smith's deposition, in which she both adopts and disputes details of various events, is also in the record. However, Smith submits no other evidence to support the positions taken in the declarations.[20]

---

[20] Although Smith disputes some of the facts in the record, she does so without offering any objective evidence to corroborate the claims in her declarations. Therefore, these disputes do not create a dispute of material fact that would prevent the Court from granting summary judgment. VHDA has provided overwhelming and consistent evidence that Smith did not meet VHDA's legitimate job expectations at the time of her 2017 Performance Review, therefore, Smith cannot simply rely on her own declarations to support her contention that she did so. *See King*, 328 F.3d at 149; *Macon*, 2011 WL 4925083, at \*8.

Courts, including this Court, have consistently held that a plaintiff's "own testimony . . .

cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer's]

expectations." *King*, 328 F.3d at 149 (citations omitted); *Evans*, 80 F.3d at 960 (stating that "[i]t

is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff"

(internal quotation marks and citations omitted)); *Macon*, 2011 WL 4925083, at *8 (stating that

plaintiff's "own testimony cannot establish a genuine issue as to whether he [or she] was meeting

[his or her employer's] expectations" (citations omitted)). The Fourth Circuit "generally

consider[s] self-serving opinions, without objective corroboration not significantly probative."

*Evans*, 80 F.3d at 962. Because Smith submits no objective evidence to corroborate her

testimony that she was meeting VHDA's legitimate expectations and VHDA has submitted

evidence to show that she was not, Smith has failed to establish the second element of a gender

or race discrimination claim under Title VI, Title VII, or § 1981. Therefore, VHDA is entitled to

summary judgment on Smith's gender and race discrimination claims.

### 3. Because Smith Voluntarily Resigned, Smith Cannot Show that VHDA Subjected Her to an Adverse Employment Action

Even if the Court were to find that Smith submitted sufficient evidence to show that she

met VHDA's legitimate expectations, the same outcome would result because Smith has failed to

show that VHDA subjected her to an adverse employment action—the third required element of

a race or gender discrimination claim.

---

To meet her burden and require the Court to deny the Motion for Summary Judgment, Smith must support her claim with evidence from the record. *See* E.D. Va. Loc. Civ. R. 56(B); *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (finding that "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing there is a genuine issue for trial'" (quoting Fed. R. Civ. P. 56(e))). As the Court has previously explained, the items in the record on which Smith relies do not support her contention that she met VHDA's legitimate expectations at the time of her 2017 Performance Review. Therefore, no genuine dispute of material fact exists.

Here, Smith voluntarily resigned from VHDA. In her response to the Motion for Summary Judgment, she does not contend that her resignation constitutes an adverse employment action. Rather, she states that because she did not receive a bonus or merit increase as a result of her 2017 Performance Review, VHDA subjected her to an adverse employment action. (Resp. Mot. Summ. J. 7.) Smith confirmed at the January 16, 2020 Hearing that her 2017 Performance Review serves as the adverse employment action on which she relies to support her claims.

The Supreme Court of the United States has stated that a "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted). It recognized that a "tangible employment action in most cases inflicts direct economic harm." *Id.* at 762.

However, economic harm alone, is not enough to rise to the level of an adverse employment action. Rather, "courts in the Fourth Circuit have held that neither the receipt of a negative performance evaluation nor the denial of a discretionary bonus constitute adverse employment actions under Title VII." *Harris v. The Vanguard Group, Inc.*, No. 3:15cv382, 2015 WL 9685565, at *3 (W.D.N.C. Nov. 6, 2015) (citing cases), *report & recommendation adopted at* 2016 WL 110600; *aff'd* 667 F. App'x 815 (4th Cir. 2016). Similarly, "neither oral nor written reprimands constitute the sort of adverse employment action cognizable under Title VII unless [the] plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action." *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 819 (E.D. Va. 2016). "[A] poor performance evaluation 'is actionable only where the

employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (citing *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)).

Under this legal standard, VHDA did not subject Smith to an adverse employment action. First, case law makes clear that VHDA's refusal to award Smith a merit increase in pay or a bonus following her 2017 Performance Review is not an adverse employment action. *Harris*, 2015 WL 9685565, at *3 (stating that "the denial of a discretionary bonus" does not constitute an adverse employment action under Title VII). Second, Smith's poor performance evaluations cannot constitute adverse employment actions because neither performance review "detrimentally alter[ed] the terms or conditions of [her] employment." *James v. Booz-Allen*, 368 F.3d at 377. Third, Smith's contentions that her supervisors at VHDA counseled her both formally and informally cannot serve as the adverse employment action she suffered because her employment did not change as a result of these counseling sessions.[21] *Hinton*, 185 F. Supp. 3d at 819. Finally, even if the Court were to consider Smith's untimely allegations regarding the

---

[21] Smith disputes that the 26 hours she spent on personal telephone calls during a period of five months, as addressed in her 2016 Correction Counseling, constitutes "excessive time on personal phone calls." (Resp. Mot. Summ. J. 5.) At the January 16, 2020 Hearing, Counsel for Smith stated that this evidence shows that Smith spent approximately ten minutes per day on personal telephone calls. Counsel for Smith also explained that this information formed a part of a greater pattern which shows that VHDA's reasoning for Smith's 2017 Performance Review was pretext for race discrimination.

Although the Court finds this argument, as presented, persuasive, even if the Court were to consider these allegations, they would fail to support Smith's claims. In her 2017 Performance Review, VHDA rated Smith as "Fair but needs improvement." (2017 Performance Review.) The evidence VHDA submitted shows a history of performance issues throughout Smith's employment. Her 2016 Performance Review specifically warned Smith that if she did not continue to make improvements in several areas, she would not receive the same rating for her 2017 Performance Evaluation. (*See generally* 2016 Performance Review.) VHDA also submitted evidence to show that it counseled Daneker, a Caucasian male, on his personal telephone usage during this same period. (Kirkland Decl. ¶ 30; Howard Decl. ¶ 10.) Smith's argument regarding this single finding does not alter the Court's determination here.

seating chart implemented by Kirkland[22] or the snow day on which she alleges VHDA required

her to work, these allegations could not serve as the adverse employment action necessary for her

race and gender claims. These incidents are not "significant change[s] in employment status"

and do not, therefore, meet the definition of an adverse employment action. *Burlington Indus.,*

*Inc.*, 524 U.S. at 761.

Because Smith has not established that VHDA subjected her to an adverse employment

action, she has also failed to meet the third element of a prima facie case for race or gender

discrimination. Therefore, even if the Court were to find that she met VHDA's legitimate

expectations, it would still conclude that VHDA is entitled to summary judgment on her race and

gender discrimination claims.[23]

### C. The Court Will Grant VHDA Summary Judgment on Smith's Retaliation Claims

VHDA is also entitled to summary judgment on Smith's retaliation claims. Smith

generally alleges that her supervisors at VHDA—namely Kirkland—retaliated against her for

complaining about the race and gender discrimination she faced.

---

[22] During the January 16, 2020 Hearing, Counsel for Smith stated that he offered this information as background of Smith's discrimination and retaliation claims. However, even if Smith's allegations as to the seating chart could be deemed timely, the Court would find that they do not suffice to support Smith's claims because VHDA has provided a "legitimate, nondiscriminatory reason" for the seating chart. *See McDonnell Douglas*, 411 U.S. at 802. Specifically, in her declaration, Kirkland states that "the seats were organized by job titles and corresponding levels of IT support being offered to customers." (Kirkland Decl. ¶ 43.) In her deposition, Smith acknowledges that Kirkland gave this same explanation when Smith questioned her about the seating chart. (*See* Smith Dep. 100–01.) Smith also conceded that she sat closer to Best, a Caucasian employee, and Wai, an Asian American employee, than to Marco Howard, an African American employee. (*Id.* 91.) Based on this testimony, Smith has not presented evidence sufficient to show that VHDA proffered this explanation as pretext for discrimination.

[23] As Smith has not demonstrated a prima facie case of race or gender discrimination, the Court need not proceed to the second and third step of the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas*, 411 U.S. at 802.

### 1.    Legal Standard:  Retaliation Claims

Title VII and Title VI prohibit employers from retaliating against employees who oppose

discrimination.  42 U.S.C. § 2000e-3(a); *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)

(stating that a cause of action for retaliation exists under Title VI).  Under both Title VII and

Title VI a court considers a retaliation claim using the now familiar *McDonnell Douglas*

standard.  *See Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 312 (4th Cir. 2015) ("In

the Fourth Circuit, the burden-shifting framework established in *McDonnell Douglas* . . . applies

to Title VII claims, including . . . retaliation claims." (citations omitted)); *Peters*, 327 F.3d at 320

n.15 (setting forth the elements of a Title VI retaliation claim and stating that "[r]etaliation may

be proved either via direct evidence or the burden shifting scheme of *McDonnell Douglas Corp.*

*v. Green.*")

To state a prima facie case of retaliation under Title VI a plaintiff must show: "(1) that

[he or] she engaged in protected activity; (2) that [his or her employer] took a material adverse

employment action against [him or] her; and (3) that a causal connection existed between the

protected activity and the adverse action."  *Peters*, 327 F.3d at 320 (citations omitted); *see*

*Young*, 108 F. Supp. 3d at 314 (identifying the same elements to state a retaliation claim under

Title VII).

### 2.    Smith Participated in a Protected Activity on Three Occasions

Smith describes several instances in which she complained to her supervisors.  In three of

those interactions she specifically mentioned gender or race.  Therefore, Smith has shown that

she engaged in a protected activity sufficient to meet the first element of a prima facie

retaliation claim.

To establish a prima facie case of retaliation, Smith must show that she engaged in a protected activity. *See Peters*, 327 F.3d at 320; *Young*, 108 F. Supp. 3d at 314. "[I]n the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). Smith's case potentially raises only one category: opposition. "[P]rotected oppositional activities may include staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities . . . as well as complaint[s] . . . about suspected violations." *Id.* (internal quotation marks and citations omitted). "No particular magic words are required, all that is necessary is that 'the employee at least have actually opposed employment practices made unlawful *by Title VII*,'[24] rather than raised generalized workplace grievances." *Young*, 108 F. Supp. 3d at 317 (citations omitted) (emphasis in original). "[G]eneral concerns about . . . workload, hours, and denial of leave" do not rise to the level of a protected activity. *Sajadian v. Am. Red Cross*, 202 F.3d 260, at *1 (4th Cir. 1999). A general complaint that an employee feels as if he or she is being treated unfairly, does not rise to the level of a protected activity. *Harris v. Home Sales Co.*, No. RDB 09-1109, 2011 WL 826347, at *5 (D. Md. Mar. 7, 2011) (stating that a "one sentence allusion to unfair treatment is not enough to trigger the protections of Title VII and Section 1981 or to put [the employer] on notice that [the employee] felt he was being discriminated against on the basis of his race"), *aff'd* 499 F. App'x 285 (4th Cir. 2012).

First, Smith says that she complained to Pike in "late 2015" that she "felt that [she was] being harassed and that it's a racist thing because" the Support Analysts, who she referred to as "worker bees," completed work while other employees "relax and do nothing." (Smith Dep. 217.) Smith contends that she used the word race, but did not discuss gender in this complaint.

---

[24] The standard applies "not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." *Navy Fed. Credit Union*, 424 F.3d at 406 (citations omitted).

(*Id.*) Second, Smith contends that she complained to Pike "in January of 2016" about becoming the "primary phone person." (*Id.* 218–19.) She maintains that she used the word race in that conversation as well but did not mention gender. (*Id.* 219.) Because Smith contends that she used the word race, these complaints serve as the protected activity to support her retaliation claims. *See Navy Fed. Credit Union*, 424 F.3d at 406 (stating that a "complaint[] . . . about suspected violations" could constitute a protected oppositional activity).

Third, Smith contends that in June or July 2016, Smith complained to Burke in Human Resources that Pike and Kirkland "were racist." (Smith Dep. 227.) During that meeting, Smith also mentioned that she "felt like [she was] being discriminated against on the basis of [her] gender." (*Id.* 229.) As for this part of her complaint, Smith stated that her supervisors did not "help [her] out when [she has] stuff to lift." (*Id.*) Because Smith specifically stated that Pike and Kirkland discriminated on the basis of race and gender, this complaint also serves as a protected activity. *See Navy Fed. Credit Union*, 424 F.3d at 406.

Therefore, Smith describes at least three instances in which she complained to her supervisors of race discrimination and one incident in which she complained of gender discrimination, therefore, she meets the first element of a prima facie retaliation claim— engaging in a protected activity.[25]

---

[25] In her deposition, Smith also states that she complained "in June of 2015" to Kirkland about the new staffing model that required her to provide primary phone coverage while other employees did not have to answer the phone. (Smith Dep. 206–07.) Smith admits that she said to Kirkland: "What are they going to do while we answer the phone calls?" (*Id.* 207.) She concedes that she did not use language that referred to the employees' race. (*Id.* 208.) This general complaint cannot serve as a protected activity. It cannot be said that Kirkland knew that Smith complained of race discrimination from this statement. Smith did not mention the employee's race and nothing would have put Kirkland on notice that Smith referenced the employee's race. *See Harris*, 2011 WL 826347, at *5; *McNair v. Computer Data Sys., Inc.*, 172 F.3d 863, at *5 (4th Cir. 1999) (unpublished) (table decision) (finding that an employee's letter that "manifested [the employee's] 'concern' that she had generally been treated unfairly" did not constitute a protected activity.)

### 3. Because Smith Did Not Suffer a Materially Adverse Employment Action, VHDA is Entitled to Summary Judgment on Smith's Retaliation Claims

Viewing the undisputed facts favorable to Smith, the record suggests that Smith participated in protected activities three times. But Smith has not shown that VHDA subjected her to a materially adverse employment action. For this reason, VHDA is entitled to summary judgment on Smith's retaliation claim.

To satisfy the second element of a prima facie retaliation claim, a plaintiff must show that his or her employer subjected him or her to a materially adverse action. *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 67–68 (2006). The Supreme Court stated that a Title VII "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks and citations omitted). The *Burlington* court explained that it required "*material* adversity because [they] believe it is important to separate significant from trivial harms." *Id.* Further, it stated that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* The Supreme Court maintained that "[c]ontext matters." *Id.* at 69.

Here, although Smith's complaints to Pike in late 2015 and January 2016 constitute a protected activity, Smith admitted in her deposition that Pike did not retaliate against her following her complaints. (Smith Dep. 218, 221.) Therefore, these complaints cannot support Smith's retaliation claims.

Smith's complaint to Burke in June or July 2016 also constituted a protected activity. Smith contends that following this complaint she received "correction write-ups." (*Id.* 235.) She

also states that following her complaint to Burke, Pike told her "to give him a two-week notice for FMLA" and asked her to find someone "to cover for" her. (*Id.*) Smith's correction write-ups cannot serve as the materially adverse employment action because they would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Parsons v. Wynne*, 221 F. App'x 197, 198–99 (4th Cir. 2007) (unpublished) (citations omitted) (stating that neither a performance evaluation nor removal from an alternative work schedule "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination'" (citing *Burlington*, 548 U.S. at 68)). Similarly, Smith's contention that Pike asked her to find phone coverage and asked for notice regarding her extended leave does not amount to a materially adverse employment action. These actions constitute "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68.

Because Smith has not shown a materially adverse employment action following her engagement in a protected activity, she cannot establish the second element of a prima facie retaliation claim. Therefore, VHDA is entitled to summary judgment on Smith's retaliation claims.

> **4. Even if Smith Could Show a Materially Adverse Employment Action, She Cannot Show a Causal Connection Between Her Protected Activity and the Materially Adverse Employment Action**

Even if these correction write-ups or Pike's requests were to constitute materially adverse employment actions, no causation exists between Smith's protected activity and those actions. Therefore, Smith has not shown the third required element of a prima facie retaliation claim.

Specifically, as the evidence VHDA submitted shows, VHDA issued Smith multiple correction counseling memorandums throughout her twelve-year employment with VHDA.

These Correction Counseling memoranda show a history of repeated performance issues and correspond to the feedback Smith received in her performance evaluations. Therefore, Smith has not shown that her complaints caused her correction write-ups. *See McDonnell Douglas*, 411 U.S. at 802 (stating that plaintiff bears the initial burden of establishing a prima facie case of discrimination).

Further, even if Smith's complaint gave rise to some of Smith's correction write-ups, she has not fulfilled the causation element. Here, Smith alleges that she made this complaint to Burke in June or July 2016. The evidence VHDA submitted shows that the next correction counseling that Smith received took place over six months later, in February 2017. (Feb. 2017 Correction Counseling.) "Regarding temporal proximity, the Fourth Circuit has ruled that when 'at least three to four months separated the [materially adverse employment action] . . . and the claimed protected activities' the time period was too long to establish a causal connection on the basis of temporal proximity alone." *Lorenz v. Fed. Exp. Corp.*, No. 7:10cv487, 2012 WL 4459570, at *11 (W.D. Va. Aug. 17, 2012). Here, the six-month period of time separating Smith's complaint and the next correction counseling she received severs the causal connection between the two.

Because Smith has failed to show a causal connection existed between the protected activity and the materially adverse action, she cannot show a prima facie case of retaliation. Therefore, VHDA is entitled to summary judgment on Smith's retaliation claims.[26]

---

[26] Similar to Smith's race and gender discrimination claims, because Smith has not demonstrated a prima facie case of retaliation, the Court need not proceed to the second and third step of the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas*, 411 U.S. at 802.

## V.  Conclusion

For the foregoing reasons, the Court will grant the Motion for Summary Judgment.  (ECF No. 26.)  The Court will deny as moot the Motion for Leave.  (ECF No. 30.)

An appropriate order shall issue.

_____/s/_____

M. Hannah Lauck
United States District Judge

Date: 2/4/2020
Richmond, Virginia